

FILED
2016 Mar-16  AM 10:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **MED-INTELLIFLUX, L.L.C.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. 5:14-cv-0111-CLS** |
| | ) | |
| **RAINTREE CARE** | ) | |
| **MANAGEMENT, L.L.C., and** | ) | |
| **RT ONCOLOGY SERVICES** | ) | |
| **CORPORATION,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

This action is before the court on a motion for partial summary judgment filed by plaintiff, wherein plaintiff requests that the court grant summary judgment in its favor on:  its claim for breach of contract; defendants' counterclaim for breach of contract; and defendants' counterclaim for unjust enrichment.[1]  Upon consideration of the pleadings, briefs, and evidentiary submissions, the court concludes that the motion should be denied.

The case originally was filed in the Circuit Court of Madison County, Alabama on December 17, 2013.[2]  The case was removed to this court on January 17, 2014, on

---

[1] Doc. no. 39 (Brief in Support of Motion for Partial Summary Judgment), at ECF 3.

[2] *See* doc. no. 1 (Notice of Removal-Exhibit A), at ECF 10.  "ECF is the acronym for Electronic Case Filing, a filing system that allows parties to file and serve documents electronically." *Atterbury v. Foulk*, No. C-07-6256 MHP, 2009 WL 4723547, *6 n.6 (N.D. Cal. Dec. 8, 2009).

the basis of the parties' complete diversity of citizenship and satisfaction of the requisite amount in controversy.[3]  *See* 28 U.S.C. §§ 1332(a)(1), (c)(1); 28 U.S.C. § 1441(b).  Plaintiff Med-Intelliflux, L.L.C., is an Alabama limited liability company with its principal place of business in Madison County, Alabama.[4]  Defendant RainTree Care Management, L.L.C., is a Delaware limited liability company with its principal place of business in San Diego, California.[5]  Defendant RT Oncology Services Corporation is a Delaware corporation with its principal place of business in San Diego, California.[6]  The defendants will collectively be referred to in this opinion as "RainTree."

Med-Intelliflux was formed in Madison County, Alabama on September 30, 2011.[7]  The company's stated purpose was to analyze "medical data related to the

_____

Bluebook Rule 7.1.4 allows citation to "page numbers generated by the ECF header."  *Wilson v. Fullwood*, 772 F. Supp. 2d 246, 257 n.5 (D.D.C. 2011) (citing The Bluebook: A Uniform System of Citation R. B. 7.1.4, at 21 (Columbia Law Review Ass'n *et al.* Eds., 19th ed. 2010)).  Even so, the Bluebook recommends "against citation to ECF pagination in lieu of original pagination." *Wilson*, 772 F. Supp. 2d at 257 n.5.  Thus, unless stated otherwise, this court will cite to the original pagination in the parties' pleadings.  When the court cites to pagination generated by the ECF header, it will, as here, precede the page number with the letters "ECF."

[3] *See* doc. no. 1 (Notice of Removal), at ECF 1.

[4] *See id.* at ECF 12, ¶ 1.

[5] *See id.* at ECF 12, ¶2.

[6] *See* doc. no.16 (Amended Complaint), at ECF 1.  RT Oncology Services Corporation was first named as a defendant in the *amended complaint*.

[7] Doc. no. 40-5 (Walton Deposition), at 34; *see also id.* at 250 (characterizing Med-Intelliflux as a "start-up" company at the time of the events made the basis of this action); *see also Business Entity Details:  Med-Intelliflux*, ALABAMA SECRETARY OF STATE (last accessed Feb. 8, 2016), http://arc-sos.state.al.us/cgi/corpdetail.mbr/detail?corp=026882&page=name&file=.

application and/or use of certain prescription drugs," and track "the usage of those drugs to the treatment of certain specific cancers," in order to subsequently sell that data to "hedge funds, mutual funds, broker dealers and other investment entities."[8]

An individual named Gary Walton is the President and Chief Executive Officer of Med-Intelliflux.[9]   Walton possesses both a bachelor's and a doctorate degree in pharmacy, and a master's degree in business administration.[10]   He trained as a "clinical pharmacy specialist at [the] Huntsville Hospital residency program and . . . trained as an oncology pharmacy specialist at MD Anderson in Texas."[11]   Walton became the Director of Pharmacy Operations at Clearview Cancer Institute ("CCI") in Huntsville, Alabama in 1997, and became CCI's first Chief Executive Officer in 2009.[12]   Notwithstanding his extensive background in pharmacy and business administration, Walton has no experience in professional sales, the financial services

---

[8] Doc. no. 16 (Amended Complaint), ¶¶ 6-7.  Walton testified that his company sought to "follow diseases that we knew were going to have some new launches on the market and might impact market share, and so we started with seven cancers that were pretty hot in the research arena." Doc. no. 40-5 (Walton Deposition), at 196.  Those included malignant neoplasm of prostate; malignant neoplasm of colon; malignant neoplasm of female breast; malignant neoplasm of trachea bronchus and long; malignant melanoma of skin; secondary malignant neoplasm of bone and bone marrow; and multiple Myeloma.  *See* doc. no. 40-8 (Statement of Work), at 3.

[9] Doc. no. 40-5 (Walton Deposition), at 192.

[10] *Id.* at 17.

[11] *Id.* at 18 (alteration and ellipsis supplied).

[12] *Id.* at 20, 24.  Walton still is the CEO of Clearview Cancer Institute.  *See Gary Walton*, LINKEDIN.COM (last accessed Mar. 15, 2016), https://www.linkedin.com/in/gary-walton-30bb8611.

industry, or computer programming.[13]

The concept of Med-Intelliflux materialized in December of 2010, when CCI transitioned  to the use of electronic medical records ("EMRs"),[14] and began to explore ways in which to monetize that electronic data.[15]  As Walton recalled:

> Once we integrated EMR into [CCI's] practice, which was December 2010, I've got several colleagues and, you know, counterparts around the country who had practices and they were selling data to pharmaceutical companies; and they already had EMR in place.  And so I went to — I called in a couple of pharmaceutical partners that we use their products and so forth, and I said we've got an EMR.  We'd like to monetize our data.  This was strictly for CCI.  We'd like to monetize our data.  And, you know, they came through — yeah, you know, your data set looks decent but it's a single-center data.  And if we want single-center data we can go to some larger practices around the country and get that.  *Really what you need to do is you need to combine your data and — with other practices and it makes it a more robust data set that probably has more value.*
>
> I did that.  I called a few colleagues around the country and they agreed to do it, but they wanted — they didn't want it to be a CCI project.  *They wanted it to be another company and that company purchased data from the practices including CCI.*  And so that was — that was the origination of the Med-Intelliflux concept.

Doc. no. 40-5 (Walton Deposition), at 31-32 (alteration, emphasis, and ellipsis

---

[13] Doc. no. 40-5 (Walton Deposition), at 51-52, 149.

[14] "An electronic medical record (EMR) is a digital version of a paper chart that contains all of a patient's medical history from one practice."  *What is an Electronic Medical Record (EMR)?*, HEALTHIT.ORG (last accessed Mar. 15, 2016), https://www.healthit.gov/providers-professionals/electronic-medical-records-emr.

[15] Doc. no. 40-5 (Walton Deposition), at 31-32.

supplied).

Walton, at that time, served upon the advisory board of RainTree, an entity that had "started out as a company that went to pharmaceutical manufacturing firms to get GPO contracts for people — practices who were having to start and purchase oral oncolytics."[16]  RainTree later expanded its business into the realm of data sales.[17] RainTree previously had undertaken data sales projects for CCI, so Walton approached John Dempsey at RainTree regarding the prospect of a data purchase arrangement for his new company, Med-Intelliflux.[18]  In Walton's own words,

> I approached John about this business that we had just recently got funding for and what we were going to do.  I approached him about what they were going to do and how, you know, okay, if you're going into the pharmaceutical [sector] I don't want to compete with you and your data.  You own the data so we'll go into Wall Street in the financial sector, financial services sector, but it would be more efficient for us to buy it from one data pipe versus a bunch of pipes all over the country. And he thought that that would be a good revenue stream for [RainTree].

Doc. no. 40-5 (Walton Deposition), at 179 (alterations supplied).

Med-Intelliflux and RainTree had commenced contract negotiations by late

---

[16]  Doc. no. 40-5 (Walton Deposition), at 165. "GPO" stands for "group purchasing organization." *Id.*

[17] *Id.* at 40-41.

[18] *Id.* at 178.  RainTree, like Med-Intelliflux, was a fairly new company, and Gary Walton was RainTree's third customer.  *See* doc. no. 40-1 (Burks Deposition), at 22, 27, 56.

2012. Walton realized, based upon discussions with colleagues around the country, that Med-Intelliflux needed to acquire data from "at least 500 physicians who regularly utilized or prescribed cancer drugs" in order to obtain and keep investment entities as clients.[19]  He testified that, during late February or early March of 2012, "we [*i.e.*, Med-Intelliflux] were told that our footprint was too small for the number of physicians that we had."[20]  Walton dealt almost exclusively with John Dempsey (RainTree's Director of Pharmacy Services)[21] and Lisa Burks (Senior Director of RainTree's Program Management Office)[22] in negotiating the Agreement with RainTree.[23]  According to Walton, both Dempsey and Burks said, during "multiple discussions," that they could obtain data from *600* medical oncologists, which was critically important, because "the primary reason for using RainTree was because of their medical oncology footprint."[24]

---

[19] *See* doc. no. 40-5 (Walton Deposition), at 31-32.

[20] *Id.* at 87 (alteration supplied); *see also id.* at 88 (wherein Walton discusses Med-Intelliflux's need for a bigger "footprint").

[21] Doc. no. 40-2 (Dempsey Deposition), at 6.

[22] Doc. no. 40-1 (Burks Deposition), at 8; *see also id.* at 17-18 (wherein Burks testified that he role, with regard to Med-Intelliflux, was to work on "requirements" after the Agreement was signed, and to "collect[] that information from Gary [Walton] as to what he was looking to obtain from RainTree") (alterations supplied).

[23] *See* doc. no. 40-5 (Walton Deposition), at 277-78 (only John Dempsey and Lisa Burks were involved, on RainTree's end, in the negotiation of the Statement of Work and Master Services Agreement).

[24] *Id.* at 217.

Med-Intelliflux asserts in its amended complaint that Dempsey and/or Burks represented, in or about March of 2013 — *the month preceding the execution of the parties' written Agreement* — that:

(1) RainTree had *more than six hundred (600) medical oncologists* in its network who utilized and/or prescribed cancer drugs and from which RainTree could obtain data that Med-Intelliflux could use to track the prescriptions of cancer drugs to the treatment of specific actual cancers; (2) RainTree had *approximately thirty (30) oncology practice members* comprised of oncologists and radiation oncologists from which it collected data which Med-Intelliflux could use to track the prescriptions of cancer drugs to the treatment of specific actual cancers; (3) RainTree could provide the data reports in a longitudinal fashion[25] so Med-Intelliflux could use it to track or map the use of certain cancer drugs to the treatment of certain cancers; and (4) RainTree had the ability to provide data that could be used by Med-Intelliflux to conduct its business.

Doc. no. 16 (Amended Complaint), ¶ 9 (emphasis and footnote supplied).

The parties' negotiations finally culminated in the signing of a "Master Services Agreement" on April 1, 2013.[26]   The parties subsequently executed a "Statement of Work" on April 16, 2013, and that document was incorporated by reference into the Master Services Agreement.[27] The Master Services Agreement and Statement of Work collectively embody the parties' written "Agreement."  RainTree primarily authored the documents comprising the Agreement, but Gary Walton

---

[25] "Longitudinal fashion" means that data could continuously be uploaded.  *Id.* at 220.

[26] Doc. no. 40-7 (Master Services Agreement), at 1.

[27] *See* doc. no. 40-8 (Statement of Work), at 2, 7.

participated in, and offered feedback during, the editing process.[28]

Significantly, the finalized Statement of Work *did not* include a provision

stating that RainTree had a duty to provide data from at least thirty oncology practices

or 500 medical oncologists.  Rather, the totality of what was said in the Statement of

Work about "thirty practices" was set forth in an *introductory* section entitled

"Executive Summary," which reads as follows:

> RT Oncology Services Corporation operates through RainTree
> GPO, RainTree Care Management, and RainTree Administrative
> Services.  RT Oncology Services Corporation *has approximately 30
> (thirty) oncology practice members*, comprised of oncologists, radiation
> oncologists and collocated physicians in related specialties.   Our
> member practices represent some of the leading community oncology
> practices in the country and include many community-based oncology
> thought leaders.  RainTree has several capabilities, which include the
> ability to generate data reports that provide data elements from infusible,
> injectible, and oral oncology medications both for active treatment and
> supportive care in a de-identified patient format.  In addition, RainTree
> is able to provide these reports in a longitudinal fashion so as to provide
> insights around practice patterns which should lead to enhancements in
> patient care.  These reports can typically be delivered 2-to-4 weeks from
> the date product was dispensed.  The scope of work listed here in [*sic*]
> will address reports such as these to meet needs of the Company [*i.e.*,
> Med-Intelliflux, L.L.C.].

Doc. no. 40-8 (Statement of Work), at ECF 2 (emphasis and alterations supplied).  In

the *operative* section of the Statement of Work, entitled "Scope of Work," there is no

---

[28] Doc. no. 40-1 (Burks Deposition), at 46-48; *see also* doc. no. 40-5 (Walton Deposition), at 198.

mention of a "30-practice-group" or "500-medical-oncologist" requirement.[29] There also is no mention of any such requirements in the Master Services Agreement.[30] Gary Walton conceded, during his deposition, that there was no explicit "30 practices" requirement set forth in the Statement of Work:

> Q.   Where does the contract — where does the Statement of Work say that they're going to extract data from 30 practices and give it to Med-Intelliflux?
>
> A.   Oh, I'm sorry.  The title [of the Statement of Work] is the data extract and in the executive summary it says 30 practices. I didn't connect these two words but that's what I'm basing it on is that it's a data extract agreement and it mentions 30 practices, so — no one told me that they could not get — that we have 30 practices but we're only going to get them from 18. They just — and the data extract document it mentions 30 practices so . . .
>
> Q.   So you put those two things together?
>
> A.   Sure.

Doc. no. 40-5 (Walton Deposition), at 219-220 (alteration supplied).

Additionally, the Master Services Agreement contains an integration clause, which states:

> *This Agreement constitutes the entire agreement between the parties and supersedes all other agreements, whether written or oral, between the parties regarding the subject matter hereof*, provided, however, that any information regarding the subject matter hereof disclosed and required

---

[29] *See* doc. no. 40-8 (Statement of Work), at ECF 3-5.

[30] *See generally* doc. no. 40-7 (Master Services Agreement).

> to be maintained as confidential under a confidentiality agreement heretofore entered into between the parties shall hereafter be treated as Confidential Information disclosed under this Agreement and subject to the rights and obligations hereunder relating thereto.  No additional terms shall be implied by usage of trade, by course of dealing, or by course of performance.  In the event of any conflict between the terms and conditions in the main body of this Agreement and those in any Statement of Work, the terms and conditions in the main body of this Agreement shall govern and control, unless otherwise specifically set forth in an amendment to this Agreement.

Doc. no. 40-7 (Master Services Agreement), Subsection "D," at 8 (emphasis supplied).

With regard to the methodology for delivering the data, the parties agreed that RainTree would upload data files to Med-Intelliflux's secure website:  as Walton stated, "the process [was] we received the data, . . . QuantiTech would QA it and make sure there are no duplicate values, et cetera, and then post it to the website."[31] (QuantiTech was a company hired by Walton to build Med-Intelliflux's website and perform quality assurance reviews of incoming data).[32]  Upon receiving the first data report from RainTree on or about April 22, 2013, Walton noticed that RainTree had not provided data from at least thirty oncology practices or 500 medical oncologists; instead, RainTree had provided data from only eighteen practices.[33]  According to

---

[31] Doc. no. 40-5 (Walton Deposition), at 209 (alteration and ellipsis supplied).

[32] *See* doc. no. 46-1 (Wortman Deposition), at 35, 46.

[33] Doc. no. 40-5 (Walton Deposition), at 224, 238; doc. no. 40-1 (Burks Deposition), at 56; doc. no. 40-2 (Dempsey Deposition), at 78-79.

John Dempsey and Lisa Burks, although RainTree had thirty practices that were so-called "members" of its network, it was still "in the process of acquiring data from . . . all of its members."[34]  As Burks explained during her deposition, RainTree was still "in its infancy."[35]

The most significant holdout among RainTree's members was an entity named Florida Cancer Specialists, which had the greatest number of medical oncologists of any of RainTree's   members — *111*, to be exact.[36]  Obtaining data from Florida Cancer Specialists would have propelled Med-Intelliflux's "footprint" to a total of 392 medical oncologists, but that number still would have fallen short of Med-Intelliflux's target of at least 500 medical oncologists.[37]

By the time Walton learned that RainTree's data-gathering capabilities were more *aspirational* than they were actual, he had already marketed the services of Med-Intelliflux to "numerous customers/Investment Entities" on Wall Street, and had specifically advertised data from approximately thirty oncology firms and/or 500

---

[34] Doc. no. 40-1 (Burks Deposition), at 55-56 (ellipsis supplied); *see also id.* at 57 ("We were still negotiating for . . . medical data [from Florida Cancer Specialists].") (ellipsis and alteration supplied); *see also* doc. no. 40-2 (Dempsey Deposition), at 38 ("[T]here could have been members that he signed up that we weren't getting the data from yet."); *id.* at 40 ("I recall in November of 2012 there were 30 practices that were members of RainTree.").

[35] Doc. no. 40-1 (Burks Deposition), at 56.

[36] *See* doc. no. 40-2 (Dempsey Deposition), at 48; doc. no. 40-5 (Walton Deposition), at 227.

[37] *See* doc. no. 40-5 (Walton Deposition), at 227.

medical oncologists.[38]  Med-Intelliflux even had two clients at that time:  Viking Global Investors, L.P. (an entity that wanted to purchase *historical data*)[39] and Discovery Capital Management, L.L.C. (an entity that had pre-paid Med-Intelliflux for three months of *prospective* data and was interested in an ongoing subscription).[40] Walton testified,

> Well, the significant problem[] was that I was telling, you know, potential clients that we had a large footprint because that's what Lisa and John had told me.  And when that didn't happen we didn't get data from the number of physicians that they had told me that they were getting it from, I had — basically had to stop marketing, stop — you know, I couldn't — there's not much you can do with physicians, you know, less than 600 [medical oncologists].  We attempted, I believe, a few times to see if 281 was — you know, would generate any interest. I don't think it ever did.

Doc. no. 40-5 (Walton Deposition), at 244 (alterations supplied).[41]

Walton continued a telephone and email dialogue with John Dempsey and Lisa Burks for several months.  Both of those individuals allegedly represented that RainTree "could and would" provide reliable data from thirty oncology practices.[42]

---

[38] Doc. no. 16 (Amended Complaint), ¶ 10.

[39] *See* doc. no. 40-5 (Walton Deposition), at 207.

[40] *Id.* at 292; *see also* doc. no. 46-3 ("License and User Agreement" between Med-Intelliflux and Discovery Capital).

[41] *See also* doc. no. 40-5 (Walton Deposition), at 262 ("[W]e had to postpone operations while RainTree got into the physician practices that they were supposed to get into.") (alteration supplied).

[42] Doc. no. 16 (Amended Complaint), ¶ 11.

The parties therefore executed a "Change Order" on August 28, 2013, by which the monthly rate of payment specified in the Statement of Work — that is, $28,000 per month — would be modified to a rate of $20 per reported patient per week, "[s]*hould the contributing medical oncologist number remain below 500*."[43]  In the event that a minimum of 500 medical oncologists began to contribute to the data repository, the rate of $28,000 would be reinstated.[44]  Walton points out that, in the Change Order, RainTree "mentioned the 500, so everybody [was] aware that 500 [was] a *magic number*."[45]  Even so, RainTree never ultimately provided data to Med-Intelliflux from all of its thirty practice members, or from a minimum of 500 medical oncologists.[46]  Walton testified that he never would have agreed to the execution of a Change Order, or to a continuation of the business relationship with RainTree, if he had "known the truth about the number of physicians from which RainTree could obtain data."[47]

There appears to have been a critical failure to communicate *within* RainTree. John Dempsey testified that, once the Statement of Work was executed, he "left it to Lisa [Burks] and the team to work with Gary [Walton] to provide the end product,"[48]

---

[43] Doc. no. 40-9 (Change Order), at ECF 3 (alteration and emphasis supplied).

[44] *See id.*

[45] Doc. no. 40-5 (Walton Deposition), at 269 (alterations and emphasis supplied).

[46] *See* doc. no. 40-1 (Burks Deposition), at 56.

[47] Doc. no. 40-5 (Walton Deposition), at 268.

[48] Doc. no. 40-2 (Dempsey Deposition), at 61 (alterations supplied).

and instructed Burks to be "very clear" with Walton about the number of oncology practices and medical oncologists from which RainTree could provide data.[49]  *Even so, Lisa Burks appeared ignorant of all of that during her deposition.*  For example, she testified that she was not aware that Walton needed "a certain amount of doctors to make his product work,"[50] and thought that Walton's "ultimate goal" had to do with the "amount of data or the number of record lines that were showing on his reports."[51]  That cannot be true, however.  On March 28, 2013 — *nineteen days prior to the execution of the Statement of Work*[52] — Burks responded to an email written by Walton, wherein Walton asked, "We will be collecting data from all of the 600 med-oncs [*i.e.*, medical oncologists] once we have an agreement in place, correct?"[53]  Burks replied in unconditional terms:  "Yes, we will be providing data from *all our practices* as you require."[54]

John Dempsey also cannot feign ignorance regarding Walton's expectations of a robust "footprint," as Walton told Dempsey in an email transmitted on December

---

[49] *Id.* at 51.

[50] Doc. no. 40-1 (Burks Deposition), at 69; *see also id.* at 70 (Burks testified that prior to the execution of the Statement of Work, she was not aware that Gary expected to receive data from 500 medical oncologists).

[51] *Id.* at 73.

[52] *See* doc. no. 40-8 (Statement of Work), at ECF 8 (signed on April 16, 2013).

[53] Doc. no. 40-14 (March 28, 2013 email) (alteration supplied).

[54] *Id.* (emphasis supplied).

17, 2012 — *approximately four months prior* to the execution of the Statement of Work — that he "want[ed] to make sure that the data collections [would] include data from FCS [*i.e.*, Florida Cancer Specialists]."[55]  Dempsey testified that he told Walton that RainTree was "in negotiations" with Florida Cancer Specialists to obtain their medical data, but that FCS was non-committal and difficult to work with:  "one day, they [would] tell me one thing, and the next day, they [would] tell me another thing."[56]  Importantly, Dempsey testified that it would not have been accurate if someone had told Walton that he was going to receive data from 600 medical oncologists (*as Lisa Burks did in her March 28, 2013 email*) at the time the Agreement was signed.[57]

The problems did not end there, however.  In addition to failing to provide the "footprint" that Walton desired, RainTree began in October of 2013 to deliver *inaccurate* data to Med-Intelliflux.

Walton discovered that the data being provided by RainTree was unreliable when Med-Intelliflux's quality assurance employee, Darryl Wortman, brought some

---

[55] *See* doc. no. 40-2 (Dempsey Deposition), at 41 (citing an email with Bates Stamp Numbers RainTree 014672 through 014674, dated Dec. 17, 2012) (alterations supplied).

[56] *Id.* at 43, 47 (alterations supplied).

[57] *Id.* at 50.

so-called "red flags" to Walton's attention.[58]  Drawing upon his own pharmaceutical

expertise, Walton conducted a "line of therapy" review of the data — *i.e.*, "Does it

make sense that this drug is used in this line of therapy for this disease?"[59]  The

answer, in many cases, was *no*.  The source of the problem was a computer logic

implemented by RainTree, which had caused "the reports [to] [associate] diseases and

drugs that may not have [had] any association."[60]  In other words, "the reports at times

would incorrectly state that Patient A had taken Drug B and had had the diagnosis

when the patient may have taken Drug B but didn't have that diagnosis at all."[61]

Gary Walton therefore transmitted an email to Lisa Burks, Timothy Reese

(RainTree's Business Analyst),[62] and Darryl Wortman on October 18, 2013, in which

he stated:

> Just wanted to make sure we all agree on what we have and next steps.
>
> 1)   We feel like the developer has been arbitrarily assigning at least
> Treanda to Myeloma reports.  Could be multiple other drugs into
> other diseases but won't know for sure until the logic is reviewed.

---

[58] *See* doc. no. 40-5 (Walton Deposition), at 237, 243, 273-75; doc. no. 46-1 (Wortman Deposition), at 91-92 (In the fall of 2013, "Gary [Walton] pointed out that we weren't seeing Abraxane being used for lung cancer and he was expecting to see it.  And so that was the first indication that there may be something wrong with the data since we were not seeing that.") (alteration supplied).

[59] Doc. no. 40-5 (Walton Deposition), at 212.

[60] Doc. no. 40-3 (Skellenger Deposition), at 57 (alterations supplied).

[61] *Id.* at 58.

[62] Doc. no. 40-1 (Burks Deposition), at 43.

2)     Once the extraction logic has been identified, we can then determine the impact across all diseases.

3)     After the above is known, we will need to reconvene for next steps or decide if the project is not executable by RainTree.

Doc. no. 40-12.

RainTree's employees reacted to the situation by sending a flurry of emails to one another which, by their content, reveal that those individuals knew they had "screwed up."[63]   For example, on October 30, 2013, Lisa Burks transmitted the following email to Scott Skellenger (RainTree's Vice President and Chief Information Officer),[64] with Timothy Reese and John Dempsey copied as co-recipients of the email:

If the drug is associated to multiple disease states[, then] the ICD9 located within the patient record was listed.

However, if the drug is associated to one disease state[, then] the ICD9 listed on the SOW was applied.  This caused misrepresentation of the patient's diagnosis.  [Timothy Reese] is identifying the impact. . . .

Doc. no. 40-11 (alterations supplied).   Scott Skellenger told Doug Hostler (RainTree's Director of Information Services)[65] on November 12, 2013, "We *screwed*

---

[63] *See, e.g.*, doc. no. 40-10.

[64] *See* doc. no. 40-3 (Skellenger Deposition), at 9.

[65]   *See Doug Hostler*, ZOOMINFO.COM (last accessed Mar. 15, 2016), http://www.zoominfo.com/p/Doug-Hostler.

*up med-intelliflux* and need to fix it."[66]  Timothy Reese told Lisa Burks on November 27, 2013, "Med-Intelliflux is an *absolute mess*."[67]  Ray Hwang (RainTree's Business Analyst)[68] told David Abdelgawad (RainTree's Database and Business Intelligence Engineer),[69] on December 11, 2013, that there was an issue with the extract "either not pulling in . . . an ICD9 code at all or . . . pulling in the incorrect ICD9."[70]

The extent of the inaccuracies in the data provided to Med-Intelliflux never has been determined.[71]  Scott Skellenger testified that he tried to call Gary Walton many times in an attempt to work with him to fix the problem, but Walton ceased to communicate with him in December of 2013 and filed this lawsuit the following month.[72]  RainTree contends that the production of data reports is an "iterative process," and that Gary Walton should have continued to work with RainTree employees until the final product met his standards.[73]

RainTree attempted to correct the software defect that emerged after the

---

[66] Doc. no. 40-10 (Sealed Ex. J, at RainTree 028510) (emphasis supplied).

[67] Doc. no. 40-15 (Sealed Ex. O., at RainTree 012487) (emphasis supplied).

[68] *See* doc. no. 40-1 (Burks Deposition), at 40-41.

[69] *See David Abdelgawad*, ZOOMINFO.COM (last accessed Mar. 15, 2016), http://www.zoominfo.com/p/David-Abdelgawad/2060194847.

[70] Doc. no. 40-13 (Sealed Ex. M, at RainTree 029405) (ellipses supplied).  An ICD9 is a diagnosis code.  Doc. no. 40-1 (Burks Deposition), at 39.

[71] *See* doc. no. 40-2 (Dempsey Deposition), at 76;

[72] Doc. no. 40-3 (Skellenger Deposition), at 45-46.

[73] Doc. no. 46 (RainTree's Brief in Opposition to Med-Intelliflux's Motion for Partial Summary Judgment), at 24-25; *see also* doc. no. 40-3 (Skellenger Deposition), at 40.

> implementation of the logic change mandated by the agreed-upon
> Change Order.  This "iterative process" of observing a defect and
> working through it to the customer's satisfaction is "the normal cycle"
> in the industry, as each project "is a custom engagement."  However,
> when RainTree's work on the Med-Intelliflux issue had gotten to the
> point of potential customer satisfaction, Walton had "been disengaged
> from the process," and filed suit against RainTree a short time later.

Doc. no. 46 (RainTree's Brief in Opposition to Med-Intelliflux's Motion for Partial

Summary Judgment), at 24-25 (internal footnotes omitted).

John Dempsey characterized Gary Walton's desires as a "moving target,"

meaning "[t]hat things changed from what . . . Gary originally wanted . . . to what we

ended up providing to him."[74]  Even so, Dempsey allegedly told Walton that "if he

had to do it over again he wouldn't have taken [Med-Intelliflux] on as an account

because [RainTree] [was not] ready."[75]

Med-Intelliflux seeks damages in the amount of $3.9 million for the entire

value of the business.[76]  RainTree contends that Med-Intelliflux's failure to succeed

was not *its* fault; but, instead, was due to other factors, including:  Walton's lack of

experience;[77] Walton's "jumping the gun" in advertising data from thirty practices

and/or at least 500 medical oncologists before he actually had obtained such a

---

[74] Doc. no. 40-2 (Dempsey Deposition), at 20, 22 (alteration supplied).

[75] Doc. no. 40-5 (Walton Deposition), at 201 (alterations supplied).

[76] *See id.* at 290.

[77] *See, e.g.*, *id.* at 51-52, 83-84.

footprint from RainTree;[78] and Med-Intelliflux's inability to achieve early targets outlined in its business plan.[79]  Moreover, RainTree contends that it supplied valuable services to Med-Intelliflux and, accordingly, is owed $112,000:  the difference between the amount for which it invoiced Med-Intelliflux (*i.e.*, $166,280) and the amount Med-Intelliflux paid (*i.e.*, $54,280).[80]  RainTree alternatively seeks damages under a theory of unjust enrichment.[81]

Med-Intelliflux currently is "[s]itting idle," but is maintaining its permits with the Alabama Secretary of State.[82]  It has asserted claims of "Fraudulent Inducement to the Agreement,"[83] "Fraudulent Inducement to the Change Order,"[84] "Breach of Contract,"[85] "Fraud,"[86] "Suppression,"[87] and "Tortious Interference with Business and/or Contractual Relations"[88] against defendants RainTree Care Management, L.L.C., and RT Oncology Services Corporation.  Med-Intelliflux also requests a

---

[78] *See id.* at 131-35, 137, 139, 141, 227-78, 230, 234.

[79] *See, e.g., id.* at 84-87, 94-96, 129, 145.

[80] *See* doc. no. 5 (Answer and Counterclaim), at 17-18, ¶¶ 9-12; *see also* doc. no. 40-5 (Walton Deposition), at 298-99.

[81] *See* doc. no. 5 (Answer and Counterclaim), at 18-19, ¶¶ 13-16.

[82] Doc. no. 40-5 (Walton Deposition), at 288-89 (alteration supplied).

[83] Doc. no. 16 (Amended Complaint), ¶¶ 17-22.

[84] *Id.* ¶¶ 23-28.

[85] *Id.* ¶¶ 29-33.

[86] *Id.* ¶¶ 34-38.

[87] *Id.* ¶¶ 39-46.

[88] *Id.* ¶¶ 47-51.

judgment declaring that it "does not owe [RainTree] the amounts demanded."[89]

## I. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In making this determination, the court must review all evidence and make reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). Inferences in favor of the nonmoving party are not unqualified, however. "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983) (alteration supplied). Moreover,

[t]he mere existence of some factual dispute will not defeat summary

---

[89] Doc. no. 16 (Amended Complaint), ¶¶ 52-56 (alteration supplied).

21

> judgment unless that factual dispute is *material* to an issue affecting the outcome of the case.  The relevant rules of substantive law dictate the materiality of a disputed fact.  A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (alteration and emphasis supplied).  *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

## II.  DISCUSSION OF MED-INTELLIFLUX'S CLAIM FOR BREACH OF CONTRACT

The parties' Agreement is governed by the laws of Delaware.[90]  "The elements necessary to create a contract include mutual assent to the terms of the agreement, also known as *the meeting of the minds*."  *Thomas v. Thomas*, No. 2008-10-102, 2010 WL 1452872, at *4 (Del. Com. Pl. 2010) (emphasis supplied).  "Mutual assent requires an offer and an acceptance wherein 'all the *essential terms* of the proposal must have been reasonably certain and definite.'"  *Id.* (quoting *Gleason v. New*, No. 78-C-MR-10, 1981 WL 88231, at *1 (Del. Ch. 1981)) (emphasis supplied).  "Thus,

---

[90] *See* doc. no. 40-7 (Master Services Agreement), at 8, § G ("This Agreement shall be governed by and interpreted in accordance with the laws of the State of Delaware, excluding its choice of law provisions.").

if any portion of the proposed terms is not settled there is no agreement." *Id.* "Where there is no meeting of the minds, there is no enforceable contract in Delaware." *Rodgers v. Erikson Air-Crane Co., L.L.C.*, No. 98C-07-014-WTQ, 2000 WL 1211157, at *6 (Del. Super. 2000); *see also Hindes v. Wilmington Poetry Society*, 37 Del. Ch. 80, 83 (1958) ("[M]aterial provisions of an agreement can be so indefinite that the agreement will not be enforced. *The Most Worshipful, etc., v. Hiram Grand Lodge*, 32 Del. Ch. 85, 80 A.2d 294; *see* 1 *Williston on Contracts*, (3rd ed., *Jaeger*), § 45. However, it is equally true that *a court will not upset an agreement where the indefinite provision is not an essential term*.") (alteration and emphasis supplied).

The court finds that there was no enforceable provision *in the parties' written Agreement* that placed RainTree under an obligation to provide data from "approximately thirty" oncology practice members. As an initial matter, the Executive Summary of the Statement of Work merely appears to be a mere recital that provides a description of RainTree's *general capabilities*, rather than a description of RainTree's duties to Med-Intelliflux for purposes of this specific contract.

Three additional factors favor a finding that RainTree was not obligated, at least under the terms of the written Agreement, to provide data from "approximately thirty" oncology practices. The first is the placement of that language *before* the "Scope of Work" section — *i.e.*, the *operative or granting part* of the Statement of

Work.  *See New Castle County v. Crescento*, 1985 Del. Ch. LEXIS 449, at *8 (Feb. 11, 1985) (citing *Stabler v. Ramsay*, 62 A.2d 464 (Del. Ch. 1948)) ("Generally, *recitals are not a necessary part of a contract* and can only be used to explain some apparent doubt with respect to the intended meaning of the *operative or granting part* of the instrument.") (emphasis supplied).

The second is the use of the word "approximately."  *See Carlson v. Hallinan*, 925 A.2d 506, 524 (Del. Ch. 2006) ("Three elements are necessary to prove the existence of an enforceable contract:  1) the intent of the parties to be bound by it, 2) *sufficiently definite terms* and 3) consideration.") (emphasis supplied); *see also* the Rest. (2d) of Contracts § 33(2) ("The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.").  It would be difficult for a court to enforce a quantitative contract term containing the word "approximately," as that word breeds inherent confusion as to whether a party has sufficiently performed.

Further weakening plaintiff's position is the presence of an integration clause in the Master Services Agreement.  "The presence of an integration clause is not conclusive, however, because the intent of the parties always controls."  *Carlson v. Hallinan*, 925 A.2d 506, 522 (Del. Ch. 2006).  The factual disputes in this record must be resolved in order to determine whether the Agreement was a partially

integrated, or fully integrated, writing.  *See id.* ("A partially integrated agreement is a final expression of the terms it contains, but is not a *complete and exclusive statement of the terms on which agreement was reached*.") (internal quotation marks omitted, emphasis supplied).  If the Agreement was only *partially integrated*, then it could be supplemented by additional, consistent terms (such as a term setting forth the required quantity of medical oncologists and/or oncology practices from whom data would be forthcoming).  *See McGrew v. Vanguard Corp.*, No. C.A. 5743, 1979 WL 4635, at *3 (Del. Ch. Sept. 25, 1979) ("[W]here a writing is intended to be final but is in fact incomplete it is said to consist of a partial integration and although such a writing may not be *contradicted* by evidence of prior agreements, it may be supplemented by *additional consistent evidence*.") (alteration and emphasis supplied).

In summary, the record contains genuine disputes of material fact regarding: whether the number of oncology practices from which RainTree was to provide data to Med-Intelliflux was an "essential term"; whether RainTree's employees actually promised Walton data from at least 500 medical oncologists, or thirty practice groups and, if so, whether Walton reasonably relied upon such promises; the extent of the damage caused by RainTree's use of an unreliable computer logic; and whether Med-Intelliflux failed to mitigate its damages.  Resolution of those factual disputes is essential to determining the appropriate legal vehicle and the proper measure of

damages, if any.  Accordingly, summary judgment is due to be denied as to Med-Intelliflux's breach of contract claim.

## III.  DISCUSSION OF RAINTREE'S COUNTERCLAIM FOR BREACH OF CONTRACT

RainTree counterclaims that Med-Intelliflux breached the contract, because (1) RainTree "diligently and timely performed its obligations pursuant to the revised contract between the Parties in reasonable reliance upon Med-Intelliflux's promise to compensate RainTree in accordance with the terms of the August 28, 2013 Agreement [the Change Order, doc. no. 40-9]," and, (2) "[t]o date, RainTree has billed Med-Intelliflux $166,280 for work performed and has received payment from Med-Intelliflux of only $54,280; thus leaving a deficiency of $112,000 in the contractual sums due and owed to RainTree for work performed."[91]

RainTree's representatives admitted, in emails and in deposition testimony, that the data they submitted to Med-Intelliflux contained errors.  Even so, the extent of those errors is unclear, and it is not known whether any qualitative issues could have been resolved through Walton's continued participation in an "iterative process."  Accordingly, there exist genuine disputes of material fact, and summary judgment is due to be denied as to RainTree's breach of contract counterclaim.

---

[91] Doc. no. 5 (Answer), at 17 (alterations supplied).

## IV.  DISCUSSION OF RAINTREE'S COUNTERCLAIM FOR UNJUST ENRICHMENT

RainTree states:

14.  Whether or not the parties entered into an enforceable contract, Medintelliflux [*sic*] knowingly accepted and retained valuable data provided to it by RainTree.

15.  RainTree had a reasonable expectation that it would receive compensation for compiling the data and producing it to Med-Intelliflux.

16.  Med-Intelliflux has been unjustly enriched in that it has received and retained and presumably put to use and received compensation for the benefits of work performed by RainTree at the expense and to the detriment of RainTree.

Doc. no. 5 (Answer), at 18-19.

Med-Intelliflux contends that, because the relationship between it and RainTree was governed by an express, written contract, an unjust enrichment claim will not lie. *See, e.g.*, *Nemerc v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010) (stating that one element of an unjust enrichment claim is the "absence of a remedy provided by law"); *Segovia v. Equities First Holdings, LLC*, No. 06C-09-149-JRS, 2008 WL 2251218, at *20 ("The existence of an express contract governing the relationship between the parties precludes a party from seeking restitution through unjust enrichment."); *Bakerman v. Sidney Frank Importing Co.*, 2006 WL 3927242, at *18 (Del. Ch. Oct. 16, 2006) ("When the complaint alleges an express, enforceable contract that controls

the parties' relationship, . . . a claim for unjust enrichment will be dismissed.")
(ellipsis supplied); the Rest. (3d) of Restitution & Unjust Enrichment § 2(2) (2011)
("A valid contract defines the obligations of the parties as to matters within its scope,
displacing to that extent any inquiry into unjust enrichment.").

Even so, there are genuine disputes of material fact regarding whether the
quantity of medical oncologists and/or practice groups was an essential term of the
parties' bargain.  If agreement was not reached as to an essential term, the there may
not have been a valid contract.

Accordingly, summary judgment is due to be denied as to RainTree's
counterclaim of unjust enrichment.

## V.  ORDER

In accordance with the foregoing, plaintiff's motion for partial summary
judgment is DENIED.  This case will be set by separate order for pretrial conference
and a bench trial.

**DONE** and **ORDERED** this 16th day of March, 2016.

_____
United States District Judge